Thanks to both sides, by the way. The third case for argument is Stevenson v. Colvin. Mr. Brooks. You may proceed, sir. Thank you. May it please the Court, my name is Dave Brooks and I represent Kim Stevenson v. the Commissioner of Social Security. In a brief, we raised two separate arguments. I'm going to deal with the first one first, and that is that the ALJ made an incomplete RFC assessment, and this is found on page 5 of the decision, 16 of the administrative record. The ALJ's finding regarding the residual functioning capacity assessment was, the undersigned finds the claimant has a residual functional capacity to perform light work as defined, except and never completes the sentence. Except what? Never completes that sentence. That's it. It says that there's an exception to light work and never indicates what the exception is. Was it an error in the transcription of what the ALJ said, or what? Well, that's in the written decision. In the written decision. That was a written decision. That was an oral statement. Page 5 of the decision is an incomplete residual functioning capacity assessment. Now, opposing counsel has claimed that, in the brief, that the ALJ made a complete and discernible RFC finding, which we respectfully disagree with, and then at another point on page 18 of their brief said that it was a non-substantive clerical error that is easily remedied. We, of course, reject that as well. So, essentially, on the first argument, opposing counsel is basically trying to rewrite the ALJ's decision in a clear Chenery violation, as far as I'm concerned. Now, a lot of the brief deals with the most obvious admission in the ALJ's finding, and that deals with my client, Ms. Stephenson's impaired left hand, which is seriously impaired. I'm not going to remember the Latin expression that refers to the type of fracture she had, but Ms. Stephenson fell on the ice in Indiana in 2009, in February of 2009. She continued to work through 2012, but she had no treatment. And if you look at the record, it's a very sparse treatment. She didn't have insurance. She couldn't get treatment, and she tried to work through it for three years, but she couldn't do it after that period of time. So, obviously, it got worse and permanent. There's no question. Even the records that are available in this case reflect that it's gotten worse from the time she filed until the time of the hearing. But she has a type of fracture with her left wrist here, so that she has a deformity. And anyone would see it. Anyone that saw her saw that she had a deformity. And she can't hold her hand up like this. As a result of the break that happened that can never be repaired at this point, her hand is cocked backward a little bit like this, and then off to the side, away from the thumb. Now, the objective evidence in this case was clear, and it was not properly considered by the ALJ. First of all, the consultative examiner, Dr. Schmeichel, that Social Security sent her to on two separate occasions, both in June and September of 2012, he found that she had three out of five muscle strength. Now, opposing counsel suggested in her brief to the district court that that says she has moderate strength. First of all, the ALJ never said that she had moderate strength in her left hand. And three out of five manual muscle testing is not moderate strength. Were they referring to the other hand? No, they can't be because she had five out of five strength in her right hand. Okay, well, the point is that you're making it as somebody rated her three out of five on her left hand. That is correct. And that's the only rating that we have is that she had three out of five. And that does not mean moderate strength. That means that she could raise her arm under the force of gravity, but any pressure under that would give way. Now, five out of five muscle testing is a wide range of area. Anything that's not five out of five is an abnormality. And three out of five is a very serious finding. And that was not properly considered by the ALJ. But in addition to that, in addition to manual muscle testing, the consultative examiner for the Social Security Administration did two separate dynamometer tests. And a dynamometer is a very specific instrument that measures grip strength and the ability to use your hands to grip something. In the first time, the first test that he did on the dynamometer was that she had diminished strength from norm with her right hand as well. But in the left hand, she only had four kilograms of force that she could exert. That was the best she was able to do in three trials was four kilograms, which would be the equivalent to about 8.8 pounds. So that, as we indicated before, a 10-year-old girl who cannot exert 11.8 pounds or 11.8 kilograms of force is considered weak. So my client is much weaker than a 10-year-old girl that's weak with her left hand. And the second test indicated she could exert zero kilograms of force with her left hand, which means she has virtually no ability to grip whatsoever. Well, there's a lot of talk about what she can and can't do with her left hand, but there's also indications about her previous work. I'm not sure exactly what, or two things. Well, it was something about a computer or something. ALJ's finding was that she was capable of doing her past employment, and that is relevant in this situation because she was over 55 years old, and if she was found only capable of light work, under the medical vocational guidelines, she would be found to be disabled. The ALJ, with an incomplete RFC assessment that was presented to the vocational expert, said that she could go back and do her past relevant work, but they never even considered her grip strength at any point. The judge, the ALJ, never mentioned that she had any deficiency with her grip strength and said that she could occasionally use her hand when her physician, her treating physician, the only physician in the record that saw her more than once, said that she was disabled and couldn't work. And that's the second argument that I really haven't gotten to yet, but the ALJ totally did not consider the Social Security regulations in evaluating the medical opinion evidence in this case. Her treating physician said that she couldn't possibly work with the condition in her left hand. Okay, I don't want to diminish the left hand, but was there any part of the rest of her body that was disabled? Yes. What? She had lordosis, which means that there was objective evidence of that with an X-ray of her lumbosacral spine. That means that her back doesn't bend the right direction. It's not like spondylosis or something where it curves one way or the other. This means her back is bent backwards. And at the consultative exam, it was indicated that she had difficulty stooping, squatting, difficulty walking heel to toe, difficulty getting on and off the examination tables, difficulty getting up from a seated position. And then her own physician said that she had sitting and standing limitations, pain and fatigue would interfere with her concentration and attention, and that she'd have excessive absenteeism, that she'd be missing work all the time because of her pain. So there was also additional back questions, but the primary focus is that there was objective evidence regarding her left hand that was never considered and never mentioned in the decision whatsoever. I mean, the dynamometer is an objective test. I've used it up? When you're into your rebuttal time, you can use it any way you want. I understand. I'll reserve some of that time now. Thank you, Your Honor. Ms. Jake, you may proceed. May it please the Court, Tiffany Jake on behalf of the Acting Commissioner of Social Security. Your Honors, I'm going to jump right in, and I'm going to start with opposing counsel's first argument, and that is regarding the RFC finding. It is absolutely correct that the AOJ, his bolded RFC finding, was incomplete. It said the claimant is limited to light work except, and for what's clearly an error or some type of oversight for whatever reason, did not finish that sentence to include the non-exertional limitations. However, on page 18 of the administrative record, the AOJ explicitly indicates that her RFC includes no more than occasional handling and fingering with the left upper extremity. That is a clear finding that the AOJ makes within the decision. And let's keep in mind that there was only one severe impairment, and that was that left upper extremity impairment. I want to note at that point also, though opposing counsel talks about the back pain and lordosis, he did not challenge, the claimant did not challenge the AOJ's Step 2 finding that there was only one severe impairment. But moving back to the RFC, that conclusion with the occasional handling and fingering is buttressed by the hearing transcript. And on page 58 of the administrative record, hypothetical number 4, the AOJ limited the hypothetical person to light work, occasional handling and fingering with the left upper extremity, with some postural limitations. Now that's important because that hypothetical is the only hypothetical provided by the AOJ that included the light limitation, which opposing counsel acknowledges that the AOJ did limit her to, the occasional handling and fingering, which is explicitly noted within the body of the decision, and that resulted in a finding that the claimant could perform her past relevant work, which is consistent with the AOJ's ultimate conclusion at Step 4, that she could perform that past relevant work. Well, the past relevant work, is that what you said? Yes. Yeah, she could do that without her using her left hand? He didn't say she could do it without using her left hand, and I'm going to discuss that a little bit more when I talk about the treating source. But with regard to your question, the AOJ found that she could occasionally use that left, and let's remember that this is her non-dominant left hand. This is not her dominant hand. It's her non-dominant left hand. He said she could use it occasionally. She was no more than occasionally for handling and fingering, and the DOT defines occasionally as up to one-third of the workday. SSR Social Security ruling 8310 defines. Did you say one-third of the workday? Up to one-third of the workday. And SSR 8310 defines it as anywhere from very little up to a third of the workday. And plaintiff's own description of her past work as a computer coach, on page 198 of the administrative record, she indicated that as a computer coach, she spent no more than 1.5 hours out of an 8-hour day handling small objects, writing, or typing. So her own description of her past work is consistent with the AOJ's limitation to only occasional handling and fingering. Well, this is where we look at it. She could do most everything with at least one hand. I don't know. That's what I mean. You know, we know a lot of people that have a limitation. Right. It may be with one hand or something, but they manage to get by reasonably well. Now, that's what I keep wondering here. Does this make her totally disabled just because this one wrist is basically ruined? Absolutely not. And, well, we don't exactly concede that her wrist is completely ruined. Yeah, I know. That's my word. But even assuming that, that she doesn't, you know, it's bent this way and that way and, you know, can't move it very well so she doesn't have any confidence in it. But, you know, she can do a lot with the other. That's what I'm wondering. She can do all these things with her other hand and with the rest of her body, obviously. Yes, because under Social Security rulings, even someone with a single amputation of a hand is not found, per se, disabled just by virtue of that amputation, especially of the non-dominant limb. So the fact that she has that single impairment to her left upper extremity does not preclude work activity just on its own, especially considering the medical evidence. Now, opposing counsel talks about the medical evidence regarding her hand, but the medical evidence in this case actually supports significantly greater limitation than she and the treating source assesses. The treating source himself consistently found through October 2013 that she had good range of motion of her left hand and wrist and he did not identify any neurological deficits. Consistently, through October 2013, he noted those findings. Good range in motion? Good range of motion of that left hand and wrist. Well, that's completely contrary to what the other side said, right? I know, Your Honor, but if you look at the administrative record, Dr. Anikwe's findings are in Exhibit 7F and 9F, and in every single visit he noted good range of motion. And that's consistent with Dr. Schmeichel in June 2012, the consultative examiner. He also noted good range of motion of that left hand and wrist with normal coordination and normal reflexes. And based on his evaluation, he found that the claimant could actually perform fine fingering manipulation, just not on a repetitive basis, which is consistent with the ALJ's RFC of occasional handling and fingering. Okay. It's pretty kind of opposite, isn't it? It is pretty opposite, Your Honor, but I think if you take a look at the record and you read our briefs, I think you'll come to the same conclusion that the commissioner does in this case. Now moving on to Dr. Anikwe's treating source opinion, the ALJ gave good reasons for discounting that opinion. And as we talked about before, the first reason she found was the consistency with the clinical evidence. As we just discussed, he consistently found good range of motion, similar to Dr. Schmeichel, who also found good range of motion, normal coordination, and normal reflexes. The ALJ found that Dr. Anikwe's assessment, he assessed that the claimant was essentially precluded from using her left hand for any manipulative task whatsoever. And based on the clinical findings that we just discussed, he found that that just was not consistent. And that is a valid consideration under 404-1527-C2-4. The ALJ also found that Dr. Schmeichel did not provide sufficient support for his evaluation. In his medical source statement dated November 2013, Dr. Anikwe also indicated that the claimant had limitations on her ability to sit, stand, and walk. However, when asked to supply the diagnosis supporting that limitation, he only mentioned that left upper extremity impairment. The ALJ reasonably found that he did not provide sufficient support for his assessment. And again, that is a valid consideration under the regulations, and it was a good reason for discounting that opinion. I did just want to discuss, opposing counsel makes a big note about the three out of five grip strength, and he makes a lot of, if you read the briefs, he makes a lot of lay assumptions about what three out of five grip strength means. We prefer to rely on Dr. Schmeichel, who examined the claimant, who's the one who determined the three out of five. And based on his determination, even with that reduced grip strength, he still found she could still perform fine-fingered manipulations with that left upper extremity. And again, I think it bears repeating that this is her non-dominant hand. She still had full function and strength of her right hand throughout the period at issue. And then the three out of five, she could do what, according to him? According to him, he's the one that assessed the three out of five. He found that she could still perform fine-fingering manipulative tasks. Basically, she could finger. She just couldn't do it on a repetitive basis, and that's consistent with the ALJ's limitation to occasional handling of fingering. I'm having a hard time picturing this hand and wrist. I am too, but I think it's helpful to note, if you look through Dr. Anikwe's, the treating sources information, he says she has a disfigurement, but he consistently calls it mild. She said he does have some disfigurement, but it's mild, and that's because she broke the wrist, did not seek medical treatment for three years, so it healed crookedly. Oh, and the last point I do think that I do need to point out to the court is opposing counsel says that at the second consultative examination in September 2012, the claimant demonstrated zero grip strength, but if we look at those records, which is the administrative record on page 262, 264, and 265, Dr. Schmeichel consistently, I think no less than five times, refers that the claimant refused to participate in testing with her left hand. So the fact that he indicated zero kilograms of force in our minds is the fact that she wouldn't do the exam. He consistently noted she refused to make a fist. She refused to engage in testing. She refused to move it. She had a splint on, and she flat out refused to use it during testing. So he couldn't test her grip strength during that second examination. You refer to a splint. She wore like a, she got just a wrist splint, like something just to wear on her wrist. Well, I mean, was that supplemental? I guess it was. It was a friend's. She got it from a friend, and she put it on her wrist. She got what? She got it from a friend. She indicated that she got the splint. It was just something off the shelf. Yeah, the doctor did not give it to her. And even Dr. Nequay notes that. She said she wouldn't do a test with or without it? She refused to do it. She refused to ball her fist. She, 262, 264, and 265, she simply refused to use it. So my time is out, but I would just like to urge the court to consider our arguments and affirm the commissioner's decision. Thank you. Thank you. Counsel? First of all, dynamometer testing is not a matter of refusal. It's a matter of how much pressure you can squeeze on the instrument. There was some testing that she refused to do because it was too painful for her to do, and I would ask you to look at what Dr. Schmeichel's actual findings were. She did not refuse. That's what the ALJ said. She did not refuse to submit to the test. And that is trying to erase the fact that just three months before, she took the test and only was able to generate four kilograms of force. So from the time of June, which she generated four kilograms of force, to September, she dropped from four kilograms to zero. There's no question that she was deficient, even in June, and there was no statement made that she didn't try. Now, there were certain times there was a progression in her hand so that when she went to the consultative exam the second time, there were certain things she did say, I can't do because it's too painful. And that's what the consultative examiner, that's Social Security's consultative examiner. Now, they want to minimize everything about the treating physician's findings. But one thing is that the movement of your, first of all, the three out of five, doesn't refer to your ability to use your hands. That's your major muscle groups. Three out of five is the strength in her left arm, not her hand's ability to grip. Those are not the testing of the same thing. That's the testing of the strength in her left arm, not in her hand's ability to grip. Those are two separate tests. In addition to the fact that she's got a weak left arm, she can't grip with her left hand. And that's not inconsequential, Your Honor, because in Social Security ruling 85-15 and 96-6P, both talk about the fact that fingering involves pinching, picking, and otherwise working primarily with your fingers, and that's more important in unskilled sedentary jobs and light jobs. So the ability to use your hands to grip stuff is not as important if you're doing heavy work, but if you're doing light work and you're doing sedentary work, it's much more important, and that eliminates clearly on the vocational aspects of both of those. Social Security rulings indicates that that eliminates a lot of jobs that you can do by the fact that you don't have the use of both hands, and that's both Social Security rulings. That's Social Security ruling 85-15 and Social Security ruling 96. Counsel? Yes. I'm sorry. Okay. Thank you very much for your consideration. The case will be taken under consideration, and thanks to both sides for the hearing.